1   DURIE TANGRI LLP
    DARALYN J. DURIE (SBN 169825)
2   ddurie@durietangri.com
    EUGENE NOVIKOV (SBN 257849)
3   enovikov@durietangri.com
    RAGHAV R. KRISHNAPRIYAN (SBN 273411)
4   rkrishnapriyan@durietangri.com
    217 Leidesdorff Street
5   San Francisco, CA 94111
    Telephone:    415-362-6666
6   Facsimile:    415-236-6300

7   DURIE TANGRI LLP
    ANDREW T. JONES (SBN 313619)
8   ajones@durietangri.com
    953 East 3rd Street
9   Los Angeles, CA 90013
    Telephone:    213-992-4499
10  Facsimile:    415-236-6300

11  Attorneys for Defendant
    CLARI, INC.

12

13              IN THE UNITED STATES DISTRICT COURT

14           FOR THE NORTHERN DISTRICT OF CALIFORNIA

15                   SAN FRANCISCO DIVISION

16  PEOPLE.AI, INC.,                    Case No. 3:21-CV-06314-WHA

17                      Plaintiff,      **REPLY IN SUPPORT OF MOTION FOR
                                        JUDGMENT ON THE PLEADINGS**
18         v.
                                        Date:    November 18, 2021
19  CLARI, INC.,                        Time:    8:00 am
                                        Ctrm:    12
20                      Defendant.      Judge:   Honorable William Alsup

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................1

II.    ARGUMENT ...............................................................................................................1

       A.     The Claims Fail *Alice* Step One. ....................................................................1

              1.     The sorting patents. ................................................................................4

                     a.     The '129 patent (ECF No. 21-1 & ECF No. 21-8 Ex. H). ...........4

                     b.     The '106 patent (ECF No. 21-2 & ECF No. 21-8 Ex. I)..............5

                     c.     The '229 patent (ECF No. 21-3 & ECF No. 21-8 Ex. J). ............5

                     d.     The '783 patent (ECF No. 21-6 & ECF No. 21-8 Ex. M). ..........6

                     e.     The '345 patent (ECF No. 21-7 & ECF No. 21-8 Ex. N). ...........7

              2.     The '634 and '132 scoring patents (ECF Nos. 21-4, 21-5, & ECF No. 21-8
                     Exs. K & L)............................................................................................8

       B.     The Claims Fail *Alice* Step Two. ....................................................................9

              1.     The sorting patents. ..............................................................................10

                     a.     Performing functions outside of the CRM is not a cognizable
                            "inventive concept" for these claims. ......................................10

                     b.     People.ai points to no other cognizable inventive concept in the
                            asserted claims. ........................................................................12

              2.     The scoring patents. .............................................................................13

       C.     The Dependent Claims Do Not Help. ..............................................................14

III.   CONCLUSION...........................................................................................................15

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

5
*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018)..................................................................................................... 14

6
*Accelerated Memory Tech, LLC v. Hulu, LLC*,
   No. CV 19-8968 PSG (SKX), 2020 WL 1934979 (C.D. Cal. Jan. 8, 2020) ...................................... 12

7

8
*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
   967 F.3d 1285 (Fed. Cir. 2020)..................................................................................................... 10

9
*ChargePoint, Inc. v. SemaConnect, Inc.*,
10   920 F.3d 759 (Fed. Cir. 2019)..................................................................................................... 13

11
*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011)..................................................................................................... 7

12

13
*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
   815 Fed. App'x 529 (Fed. Cir. 2020)........................................................................................ 9, 13

14
*Elec. Power Grp., LLC v. Alstom S.A.*,
15   830 F.3d 1350 (Fed. Cir. 2016).............................................................................................. 5, 10, 15

16
*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016)..................................................................................................... 3

17

18
*FairWarning IP, LLC v. Iatric Systems, Inc.*,
   839 F.3d 1089 (Fed. Cir. 2016)................................................................................................. 2, 3

19
*Interval Licensing LLC v. AOL, Inc.*,
20   896 F.3d 1335 (Fed. Cir. 2018)..................................................................................................... 10

21
*Knoles v. Teva Pharms. USA, Inc.*,
   No. 17-CV-06580-BLF, 2019 WL 295258 (N.D. Cal. Jan. 23, 2019) ................................................ 12

22

23
*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
   942 F.3d 1143 (Fed. Cir. 2019).................................................................................................. 3, 4

24
*Management Science Associates, Inc. v. Datavant, Inc.*,
25   510 F.Supp.3d 238 (D. Del. 2020)................................................................................................. 5

26
*Mary Helen v. Apollo Grp., Inc.*,
   652 F. App'x 556 (9th Cir. 2016)................................................................................................. 12

27
*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
28   837 F.3d 1299 (Fed. Cir. 2016)............................................................................................. 1, 2, 9

*OIP Techs., Inc. v. Amazon.com, Inc.,*
   788 F.3d 1359 (Fed. Cir. 2015)..............................................................................................7

*Procter & Gamble Co. v. QuantifiCare Inc.,*
   288 F.Supp.3d 1002 (N.D. Cal. 2017) ...............................................................................3, 7

*Two-Way Media Ltd. v. Comcast Cable Comms., LLC,*
   874 F.3d 1329 (Fed. Cir. 2017)..........................................................................................3, 7

*Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.,*
   916 F.3d 1363 (Fed. Cir. 2019)..............................................................................................8

## I. INTRODUCTION

People.ai's opposition makes two main arguments.  First, People.ai asserts that Clari oversimplifies the claims and ignores the "specific approaches that utilize specific rules to implement the inventions."  Opposition Brief, ECF No. 58 ("Opp"), at 1.  Second, People.ai argues that its *real* innovation is performing certain steps in a system other than the CRM whose data is being analyzed.  *Id.*

Both arguments fail.  With respect to the first, People.ai's insistent analogy to *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016) is unconvincing.  The claims at issue in *McRO* were directed to creating lip-synchronized facial animation by using rules that manipulated particular mathematical representations of the computer-generated avatars.  The Federal Circuit found that the claims did not merely automate prior-art human activity because animators working manually did not use the same rules recited in the claim—which were specific to the computer implementation being claimed as the invention—to create their animations.  *Id.* at 1314.  Though People.ai asserts that the limitations of its claims are similar, they are not.  They are just generic descriptions of the traditional methods of performing the claimed data processing tasks, gussied up with jargon.  Aside from implementation on a generic computer, People.ai has identified nothing in the Asserted Patents beyond the longstanding methods used by humans to receive, parse, and sort data.

The assertion that storing certain information or performing certain functions "separate from the CRM" fares no better.  First, the claims do not require the various matching steps to be performed on a separate processor, or the resulting "associations" to be stored separate from the CRM data.  Even if they did, that would not save the claims at either step 1 or step 2, because neither using a separate processor nor separate data structures to perform the steps of the claims adds meaningfully to the abstract ideas at their core.  The notion that doing so was inventive as of 2018 flies in the face of both the specification and common sense.

## II. ARGUMENT

### A. The Claims Fail *Alice* Step One.

People.ai's centerpiece argument is that its asserted claims are similar to the claims in *McRO*, 837 F.3d at 1307-08, which the Federal Circuit found passed muster at step one of the *Alice* inquiry.  *Id.* at 1316.  *McRO* addressed a method for automating the process of computer animation to produce

"'accurate and realistic lip synchronization and facial expressions in animated characters' that previously could only be produced by human animators." *McRO,* 837 F.3d 1299, 1313 (Fed. Cir. 2016).  As the Court described, prior art animators would animate a character's face to synchronize its lips to speech by manually defining what the face would look like "at certain important times," relying on their judgment to get the face to "look[] right," and then allowing the computer to interpolate the animation between the manually-set frames.  *Id.* at 1305-06.  The invention sought to automate that process using rules of a particular structure recited in the claims.  As claimed, a "set of rules" defined "morph weight sets" (a particular mathematical representation of the computer-animated character's appearance at any given time) as a function of the character's speech (the "phoneme sequence" and its timing).  Those rules would then be applied to a "timed data file" containing the sequences ***and*** sub-sequences of phonemes that the character being animated would "speak," in order to generate a stream of "morph weight sets" defining the character's lip-synchronized facial position at various times throughout the animation.  The "morph weight sets" were to be further processed using a "plurality of transition parameters" in order to create the ultimate facial animation.  *Id.* at 1307-1308.

The defendants argued that these claims merely automated conventional human activity.  The Federal Circuit disagreed because, it held, the claims recited a "distinct process" to automate what was once "driven by subjective determinations" using, instead, "specific, limited mathematical rules."  *Id.* 1314.  And the Court noted that there was no evidence that the prior art process for creating these animations, in which the artists used their subjective judgment to get the faces to align with the words being spoken at certain times in the animation, utilized rules of the form recited in the claim.  *Id.*

As the Federal Circuit later described the *McRO* claims, they "transformed a traditional subjective process performed by human artists into a mathematically automated process executed on computers." *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (citation omitted). The Court contrasted them with the claims before it in that later case, which "merely implement[ed] an old practice [of fraud detection] in a new environment" by computerized rules asking "the same questions (though perhaps phrased with different words) that humans in analogous situations detecting fraud have asked for decades, if not centuries."  *Id.* at 1094-95 (citation omitted).  And it was the "incorporation of a computer, *not* the claimed rule, that purportedly 'improve[d] [the] existing

technological process.'"  *Id.* at 1095.

As discussed in more detail below for each patent, the claims at issue here differ from those in *McRO* because they do not define any rules whose application automates a manual prior art process in an inventive way.  What People.ai identifies as "rules" are in fact result-focused limitations that just ask "the same questions" that humans matching communications to records would ask:  Whom is the message from?  To whom was it directed?  When was it sent?  What's it about?  And the answers to these generic questions lead to a desired outcome (a determination of a "likelihood that [a process] will be completed within a predetermined time period," a match between an email and a CRM record, etc.) as a result of a process that—as far as the claims are concerned—is a complete black box.  No matter how many words the claims use to define such an "invention," it constitutes functional claiming does not fall under the "technological improvement" line of cases embodied by *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016) and *McRO*.  *See Two-Way Media Ltd. v. Comcast Cable Comms., LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("We look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery."); *Procter & Gamble Co. v. QuantifiCare Inc.*, 288 F.Supp.3d 1002, 1022 (N.D. Cal. 2017), *quoting Affinity Labs. Of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (claims to "a process that . . . analyzes [an] image [of a person] to find areas containing skin defects, and then quantifies the severity of the defects and relates the severity to a particular population" invalid because it "does not indicate or provide details about how to carry out the analysis to locate the defects or enumerate their severity").

So too with *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143 (Fed. Cir. 2019).  As the Federal Circuit explained, the challenged claims there were directed to an improvement to the process for generating "check data" in data transmission systems—a "shorthand representation of a particular block of data" being transmitted that can be generated at both ends of the transmission to detect whether an error occurred during transmission.  *Id.* at 1145.  The problem with the prior art method was that "systematic error" that "repeats across data blocks in the same way" could fool the algorithm and prevent the system from reliably detecting errors.  *Id.*  The challenged claims provided a solution:  varying the specific check data generation function (itself defined in an independent claim not addressed in the

opinion) to be applied to different data blocks in the transmission in order to "reduce[] the chances that the same systematic error will produce the same defective check data across different data blocks." *Id.* at 1146. That is itself an improvement to a specific computer algorithm—not a computerized implementation of entirely generic data processing steps, as the asserted claims here are.

        1.        **The sorting patents.**

        a.        **The '129 patent (ECF No. 21-1 & ECF No. 21-8 Ex. H).**

As discussed in Clari's opening brief, the asserted claim of the '129 patent (claim 20) describes parsing an electronic activity (such as an email) and applying an unspecified "matching policy" to the identity of its sender or recipients to match it to "node profiles" (asserted to be any "data structure" containing data about an "entity"—e.g., a profile of a person) and "record objects" (CRM entries). Opening Brief, ECF No. 53-1, ("Op. Br."), at 3-4. In other words: taking an incoming mail, looking at where it came from and to whom it's addressed, and matching it to the correct contact and the correct account. *Id.* at 12-13.

People.ai's response is confusing, but it appears to be an attempt to find in the language of the claims something that can be characterized as a concrete "rule" of the sort that guided the creation of facial animation in *McRO* and was found there to be a concrete and specific method of automating a previously manual task. Opp. at 13-16. But nothing in the claim is remotely analogous. People.ai first says that "the claim recites comparing extracted data from an electronic activity to object values of record objects of systems of record." Opp. at 13. People.ai does not appear to contend that this means anything other than a generic comparison of information from an email to attributes of a CRM entry.

People.ai then says that the claimed matching "can include a one-to-many matching of electronic activities to record objects based on applying one of a plurality of matching policies that are based on senders and recipients of electronic activities." *Id.* It is not clear what "one-to-many" is supposed to mean, but if it is a reference to identifying multiple CRM entries that may match the email before settling on one—which is what People.ai appears to be getting at with the "George Costanza" example on page 15—that is a purely conventional way of correlating information and nothing like the structured automation upheld in *McRo.* And the "plurality of matching policies . . . based on senders and recipients of electronic activity" is just another restatement of the core long-standing human activity People.ai is

claiming—using the sender or recipient of a communication to match it to one or more files.  Opp. at 13.

Finally, People.ai says that the claims' reference to "one or more data source providers" and "one or more systems of record" provides something beyond an abstract idea because if the claim steps were to be performed by humans they would be sorting mail pertaining to multiple companies.  Opp. at 16.  As an initial matter, the claim does not require multiple providers or systems—under the "one or more" formulation, it could be infringed by a system that accessed electronic activities associated with *one* data source provider and maintained record objects of *one* system of record.  But even if that were not so, courts have regularly invalidated claims to tasks at least as "advanced" as sorting mail for multiple companies and matching the mail to one of a plurality of accounts within the company.  *See e.g., Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1350, 1351-52 (Fed. Cir. 2016) (finding abstract a claim directed to "performing real-time performance monitoring of an electric power grid by collecting data from multiple data sources, analyzing the data, and displaying the results") (citation omitted); *Management Science Associates, Inc. v. Datavant, Inc.*, 510 F.Supp.3d 238, 245 (D. Del. 2020) (finding patent-ineligible claims directed to " 'receiving a record,' 'generating' a token, 'creating' a de-identified record, 'matching' the token to another token, and 'linking' the de-identified record to another such record.").

In short, the claims do not recite anything that resembles the technological methods of automation or improvements to computer functionality that have been found patentable by the Federal Circuit. Stripped of jargon, they claim abstract ideas—basic ways of organizing information using a computer in a particular technological setting.[1]

### b.     The '106 patent (ECF No. 21-2 & ECF No. 21-8 Ex. I).

The asserted independent claims of the '106 patent (claims 1, 19) are substantially the same as the '129 claims, and People.ai does not make any additional arguments in support of the '106 claims beyond the arguments addressed for the '129 patent above.  Opp. at 18.

### c.     The '229 patent (ECF No. 21-3 & ECF No. 21-8 Ex. J).

The '229 patent is similar to the '129  and '106 patents but the asserted claim (claim 19) includes

---

[1] Though it bears mention that the use of deliberately vague terms like "system of record" is an attempt to preempt the field of this sort of computerized sorting even *beyond* CRM systems.

an initial step of determining "*that* the electronic activity is to be matched to at least one record object." It also splits the consideration of the sender and the recipient of the electronic activity in order to match it to record objects into separate steps, requiring the identification of one set of candidate record objects based on the sender and a second set based on the recipient.  People.ai says that these additional features render the '229 patent "further removed from any alleged human activity or conventional system" and "further support[] the conclusion that [the claim] is not directed to an abstract idea."  Opp. at 19.

It is not clear why People.ai thinks these additional limitations move the needle.  A determination "that the electronic activity is to be matched" is in some sense a prerequisite to carrying out the matching, and People.ai does not argue that the "filtering rules" to be applied to make the determination have any particular form or must be anything more specific than identifying some pieces of mail as junk and throwing them away (something humans do every day).  And splitting out the sender and recipient comparisons to generate a candidate set of record objects for each before selecting a record object common to the two sets is just another way to carry out a basic comparison of two sets of data.

### d.       The '783 patent (ECF No. 21-6 & ECF No. 21-8 Ex. M).

The main distinguishing feature of asserted claim 12 of the '783 patent is a limitation requiring the generation of a "match score indicating a likelihood of the electronic activity matching [each] candidate record object does not satisfy a threshold" and, once that occurs, generating a new record object of the appropriate type corresponding to a sender or recipient of the electronic activity.  In other words, if the system encounters an email whose sender, for example, does not have an entry in the CRM (a determination made based on no entry having a sufficiently high "match score" to the email), it will create an entry for that sender.

As Clari pointed out in its opening brief, pitched at the level of the generality of the claims, this is precisely akin to a decision by any human or machine actor that there is no existing file for a letter's recipient or sender, and that one should be created.[2]  Op. Br. at 14.  People.ai argues that these

---

[2] People.ai quibbles that it is "impossible" for a human assistant to first "identify the set of files corresponding to the company associated with the letter's return address" and then conclude that "the letter's return address is not a sufficient match to any existing file set."  Opp. at 20.  That is wrong—it is perfectly possible to identify a set of files corresponding to a *company* and then conclude that the particular *return address* (i.e., sender) does not have a file associated with it.

limitations render the claim "more specific" because they require determining a "match score" as part of

that decision.  Opp. at 20-21.  But the claims do not explain how the "match score" is supposedly

generated (e.g., any particular algorithm or set of rules that would allow People.ai to analogize the claim

to *McRO*).  The mere fact that the claim requires performing a quantification does not make it concrete—

computers inherently quantify.  *Procter & Gamble Co. v. QuantifiCare Inc.*, 288 F. Supp. 3d 1002, 1022

(N.D. Cal. 2017) (claim limitation requiring "quantif[ying] the severity" of skin defects purely functional

in the absence of a description of how the quantification process achieves the desired result); *OIP Techs.,*

*Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1361-62 (Fed. Cir. 2015) (finding abstract a method of

quantifying customer reactions to prices and using that data to estimate outcomes); *CyberSource Corp. v.*

*Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011) (finding abstract a method of validating

credit card transactions by constructing a "map of credit card numbers").

### e. The '345 patent (ECF No. 21-7 & ECF No. 21-8 Ex. N).

Asserted claim 11 of the '345 patent recites applying "one or more filtering policies" based on

keywords, regular expressions, or "logic" to two electronic activities, with the result that the first

electronic activity is "restrict[ed] . . . from being matched with one or more record objects of the system

of record," while the second electronic activity is determined not to "satisfy[] any of the selected one or

more filtering policies" and is therefore matched with one or more record objects.  People.ai does not

even attempt to argue that this claim captures anything more than a human checking whether an

incoming mail contains certain keywords and deciding whether or not to file the mail based on that

determination.  Instead, People.ai points to paragraphs in its amended complaint that quote the

specification as saying that "restricting certain electronic activities from being matched to record objects

reduces the computing resources required" and "reduces the amount of noise in systems of record."  Opp.

at 22-23, ECF No. 21 at ¶¶ 209-210.  But this is the essence of claiming the ***beneficial "result or effect"***

rather than the "specific means or method" of producing that result or effect.  *Two-Way Media Ltd.*, 874

F.3d at 1337.  It may well be true that "restricting certain electronic activities from being matched to

record objects reduces the computing resources required" and "the amount of noise," but that does not

entitle People.ai to claim the abstract concept of a filter for incoming mail with no elaboration other than

that keywords, regular expressions, *or* "logic" should be used.

2.      **The '634 and '132 scoring patents (ECF Nos. 21-4, 21-5, & ECF No. 21-8 Exs. K & L).**

People.ai essentially agrees with Clari's description of the asserted independent claims of the score patents ('634 claim 10 and '132 claim 12):  they recite using certain types of data about electronic communications pertaining to a record object (namely, the role or job title of a participant and the timing of the communication) to generate a "completion score indicating a likelihood of completing an event associated with the first record object" ('634) or a "likelihood that the process of the first record object will be completed within a predetermined time period" ('132).  They do not specify how the "completion score" or "likelihood" is to be calculated.  They are directed simply to the **idea** of parsing the claimed categories of data to (somehow) determine a "completion score" or "likelihood."

People.ai's argument that these claims are patent-eligible at *Alice* step one makes little sense. First, it says that "the consideration of each of the timestamps and at least the role, title, or department of at least one participant for each of the electronic activities not only automates determining likelihood of completion; it improves operation by dynamically considering all data available in the system which results in better determinations by the system."  But it does no such thing.  The consideration of certain types of data to determine the likelihood that something will occur does nothing to automate that determination; a human is equally capable of considering those factors.  To the contrary, unlike the claims in *McRO*, the claims of the scoring patents utterly **fail** to describe how the process will be automated; it just instructs the practitioner to "do it on a computer."  *Univ. of Fla. Rsch. Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019)  ("This is a quintessential 'do it on a computer' patent: it acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer.  We have held such claims are directed to abstract ideas.") (citation omitted).  And the consideration of certain **types** of data certainly does nothing to ensure that "all data available in the system" will be considered, dynamically or otherwise.  There is nothing about the process recited in the claims that enables anything to happen "dynamically" or in real time—it just performs a series of generic steps in order.

Second, People.ai writes that "the objective determination of a 'completion score' based on parsed data from electronic activities, timestamps associated with electronic activities, and the role, title,

or department of a person identified from those electronic[] activities is not human conduct." Opp. at 24.

Along the same lines, People.ai writes that determining the "likelihood that the process of the first record object will be completed within a predetermined time period" made based on a "field-value pair identifying the stage of the process," "a role of the first participant," and "the data of each electronic activity" is "even more removed from activities that might be carried out by a human being." *Id.* Why? It is easy to imagine an employee asked to evaluate a company's sales efforts checking when a high-ranking executive of a particular counterparty was last involved in the sales discussion and rating the likelihood of closing the deal this calendar year on a scale from 1 to 10. To the extent People.ai is suggesting that the requirement to *quantify* the likelihood renders the claims non-abstract, that argument is contrary to law, as discussed *supra* at II.A.1.a.

As for People.ai's repeated protest that Clari has not provided evidence of the claimed process being used by salespeople, no such evidence is required for the Court to make a determination that the claims are directed to an abstract idea. The Federal Circuit in *McRO* sought such evidence because the patents before it reflected a specific way of achieving a desired result using a computer—applying rulesets with particular parameters to specific types of data to generate an output in a particular format capable of driving an animation, and substituting such rules for the prior art "subjective determinations." *McRO,* 837 F.3d at 1314. The Federal Circuit did not need evidence that the input (a model of a face and audio to which the character's speech was to be synchronized) and the output (the lip-synchronized animation of the face) were routine and conventional—that much was clear from the pleadings and common sense. *Id.* at 1303. It was the claimed path from the input to the output that was assertedly novel and unconventional. The claims here specify no more than the input and the output. The Court does not need additional evidence to conclude that they are an attempt to patent the automation of conventional data manipulation tasks. *See, e.g., Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 Fed. App'x 529, 533 (Fed. Cir. 2020) (affirming § 101 invalidity at the motion to dismiss stage where key limitation was "nothing but a functional abstraction" treated as a "black box").

### B.    The Claims Fail *Alice* Step Two.

As discussed above, "[t]he claims in this case do not . . . require a new source or type of information, or new techniques for analyzing it"; nor do they entail an "arguably inventive set of

components or methods, such as measurement devices or techniques, that would generate new data" or any "assertedly inventive programming."  *Elec. Power Grp., LLC*, 830 F.3d at 1354-55.  "Inquiry therefore must turn to any requirements for *how* the desired result is achieved," and the generic "invocations of computers and networks that are not even arguably inventive" do not constitute an inventive concept.  *Id.* at 1355.

The *Alice* step two analysis focuses on the ***claims***.  Unclaimed features—such as the unrecited specifics of carrying out a process claimed functionally—cannot function as an inventive concept that removes a claim from the realm of ineligible subject matter.  *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1295 (Fed. Cir. 2020).  And an assertion that a particular computer ***architecture*** is an "inventive concept" does not pass muster where the claims do not actually recite the architecture asserted to be inventive.  *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1348 (Fed. Cir. 2018).

### 1. The sorting patents.

#### a. Performing functions outside of the CRM is not a cognizable "inventive concept" for these claims.

People.ai's main argument, which it repeats for all of the sorting patents, is that the supposed inventive concept is the separation between the CRM and other system functions.  For the '129, '106, '229, and '783 patents, People.ai argues that the inventive concept is "the storing of associations between electronic activities and record objects separate from the system of record such as the CRM."  Opp. at 17, 19, 22; *see also* Opp. at 18.  Inconveniently, the remaining sorting patent, the '345 patent, expressly requires storing the association between electronic activities and record objects *in* the system of record, not outside of it.  ECF No. 21-7 at claim 11.  For ***that*** patent, People.ai argues that "the filtering and matching steps take place outside of the CRM and the instructions concerning the filtering and matching are then transmitted to the appropriate system of record."  Opp. at 23.  In support of the notion that performing some functions related to the CRM outside of the CRM is inventive, People.ai submits a declaration from its CEO that states that People.ai's product attempts to circumvent Salesforce's limit on the number of API requests that can be made by each user by performing matching functions and storing associations outside of the CRM.  ECF No. 58-1 at ¶¶ 11-15.  There are a number of problems with this.

***First*** and most importantly, the claims do not require storing associations separate from the CRM

or performing any functions "outside of the CRM."  As to storing, the '129, '106, '229. and '783 claims simply require storing the association between the electronic activity and the at least one record object "in a data structure" or "in one or more data structures."  *See* ECF No. 21-1 ('129) at claim 20, ECF No. 21-2 ('106) at claims 1 and 19, ECF No. 21-3 ('229) at claim 19, ECF No. 21-6 ('783) at claim 12. People.ai argues that because the '129 claim recites "one or more processors" that are "configured to access electronic activities," to "maintain record objects of one or more systems of record" and "node profiles," and to "store associations" between the electronic activities and record objects, that means that the "one or more processors are separate from the processors of the CRM system and the associations between the record objects and the electronic activities are stored separate from the CRM system."  Opp. at 17.  That simply does not follow.  The claims say nothing about where the associations are stored, other than the trivial requirement that it be in a "data structure."  It would be peculiar if what People.ai asserted as the key inventive concept of its patents were not only omitted from the claims, but expressly **contravened** by one of the asserted patents (the '345 patent, ECF No. 21-7 at claim 11), which requires exactly the opposite—storing the associations *in* the system of record.[3]

Claim 11 of the '345 patent (ECF No. 21-7) recites "one or more processors" that perform a number of functions and ultimately transmit "instructions to store an association between the second electronic activity of the first record object" to the system of record (i.e., the CRM).  The claim does not require the CRM to run on different processors than the "one or more processors" performing the claimed functions.  Even if performing the filtering and matching functions "outside of the CRM" (whatever that actually means) were inventive, the claims do not reflect that requirement.

***Second***, the notion that some data processing functions related to CRM records and/or the storing of associations related to CRM records may take place in a system separate from or adjacent to the CRM itself cannot be inventive.  It is common sense (and in some ways inherent in all mental processes that use information from the outside world) that data stored in one system can be processed,

---

[3] For this reason, People.ai's assertion that the claimed invention somehow alleviates the problem of "syncing" in updating CRM systems is unavailing.  Opp. at 17.  Even if it were true that storing some information separate from the CRM itself alleviated the problem of "syncing," the claims do not reflect that alleged solution.

and derivative information stored, in another.  But it is also evident from the specification, which admits that prior to the asserted patents, enterprises "rel[ied] on the data included in their systems of records to make projections or predictions," making clear that those enterprises retrieved data from those systems, processed it, and presumably stored the results elsewhere.  ECF No. 21-7 at 50:26-28.  The specification further acknowledges "existing systems that may maintain some form of a node profile," deriding them for including "values that are static and only get updated responsive to a change made by a user"—not for storing those values in the CRM.  *Id.* at 164:33-36.  The specification then references "existing systems" again, stating that they were less accurate as a result of needing to be manually updated and again failing to mention the supposed improvement now being touted.  *Id.* at 164:60-165:2.  Thus, not only is People.ai unable to find support for its supposed "inventive concept" in the claims *or in the specification*, but the specification suggests that it was not 'inventive' at all.

**Third**, neither People.ai's attorney argument nor the declaration from its CEO can create a fact issue that would preclude Clari's motion being granted.  Even if People.ai's new allegations raised a genuine factual issue, which they do not, People.ai **pled** no facts concerning what it now alleges constitutes the core inventive concept of its patents.  Nor, as mentioned above, does People.ai point to anything in the specification to supply record support for its assertion.  Having failed to plead any facts related to the issue it now asserts precludes judgment, or to include anything about it in the patents, it cannot lob in a declaration to create a new basis on which to move forward.[4]  *Knoles v. Teva Pharms. USA, Inc.*, No. 17-CV-06580-BLF, 2019 WL 295258, at *2 (N.D. Cal. Jan. 23, 2019) (new material provided in a declaration submitted at the Rule 12(c) stage cannot be considered).

**b.  People.ai points to no other cognizable inventive concept in the asserted claims.**

The only other supposed "inventive concept" People.ai advances with respect to the sorting

---

[4] People.ai's opposition does not include a request to amend its complaint to plead additional facts.  *Mary Helen v. Apollo Grp., Inc.*, 652 F. App'x 556, 557 (9th Cir. 2016) (affirming denial of leave to amend in the absence of a request).  In any event, for the reasons discussed above, People.ai could not state a cognizable claim on this basis, and any belated request to amend to incorporate the facts from Mr. Rogynskyy's declaration should be denied as futile.  *Accelerated Memory Tech, LLC v. Hulu, LLC*, No. CV 19-8968 PSG (SKX), 2020 WL 1934979, at *7 (C.D. Cal. Jan. 8, 2020) (denying leave to amend complaint to add additional facts in view of § 101 dismissal where such allegations would not both be "consistent with the patent intrinsic record and also support a position of patent eligibility").

patents is the notion that the '783 patent's requirement of "generating a new record object, as compared to updating an existing record object" is transformative because it "improves the overall status of the system of record, and in particular, the quality and health of the system of record," and "improves the quality of analytics that can be derived from the system." Opp. at 21. However, an inventive concept under *Alice* step 2 cannot simply be the abstract idea itself—"a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly' more than that ineligible concept." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 774 (Fed. Cir. 2019) (citation omitted). The ability to generate new entries in a CRM may be beneficial, but it is still an abstract idea. The claims recite no concrete improvement to the "overall status of the system of record" or to the "analytics" that can be derived therefrom.

### 2.     The scoring patents.

With respect to the scoring patents, People.ai likewise simply points to the abstract idea itself. It writes that the scoring patents alleviate various problems associated with having to manually "update and maintain their systems of record," including time, expense, and resulting inaccuracy. Opp. at 25. It then says that the scoring patents "solve these problems by dynamically determining a completion score for a business opportunity based on timestamped information, the role, title or department of an individual identified in an electronic activity, or the stage of a record object," and that the claims are "directed to calculation of a completion score based on constantly changing variables that may be aggregated and compared for the purpose of predicting a likelihood of the completion of a certain event." *Id*. Again, the claims do not in fact recite such solutions because they do not provide a ***way*** to determine a completion score or likelihood dynamically and based on constantly changing variables. They just instruct the reader to do it somehow. *Dropbox*, 815 Fed. Appx. at 533 (claim that "recites conventional elements in a purely functional manner, without implementation detail even in the specification" lacks inventive concept).

People.ai also states that the claims "represent concrete technological improvements because they 'mak[e] it possible for the enterprise to obtain the benefit of the data within its systems of record without having to access servers on which the electronic activities matched to the record objects are stored.'" Opp. at 25. This appears to be the inverse of the argument People.ai made for the sorting patents, which was that they supposedly perform certain functions and store certain data separate from the ***CRM***—as

opposed to, here, separate from the system that stores the emails and other communications being matched to records in the CRM.  This version of the argument, however, makes even less sense.  The claims of the scoring patents recite "access[ing] for a first record object of a system of record of a data source provider, data of a plurality of electronic activities transmitted or received via electronic accounts and associated with the first record object" (ECF No. 21-5 ('132) at claim 12), and "identify[ing] a plurality of electronic activities transmitted or received via electronic accounts and associated with the first record object."  ECF No. 21-4 ('634) at claim 10.  Thus, the claims by their terms require the enterprise to "access servers on which the electronic activities matched to the record objects are stored."  To the extent People.ai is suggesting that an enterprise making use of the claimed invention will have made a ***separate copy*** of those electronic activities, this cannot be People.ai's inventive concept because the claims do not contain anything resembling such a requirement.

Because People.ai has not pointed to a plausible inventive concept or raised "factual allegations that, taken as true, [would] prevent resolving the eligibility question as a matter of law," *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018), the claims fail *Alice* step 2.

### C.    The Dependent Claims Do Not Help.

On pages 2 through 5 of its opposition, People.ai recites additional limitations of its dependent claims and asserts that they add additional requirements that bear on the § 101 analysis.  People.ai never explains how, and an examination of the claims People.ai calls out only reveals more of the same.

For example, unasserted dependent claim 19 of the '129 patent (ECF No. 21-1), which People.ai claims is "even more specific" than the independent claim, Opp. at 2, merely recites the same limitations present in independent claim 19 of the '229 patent (ECF No. 21-3), which require generating separate sets of candidate record objects, one based on the recipient of the electronic activity and the other based on the sender, and then selecting a candidate that appears in both sets.  The same is true of unasserted claim 14 of the '106 patent (ECF No. 21-2).  Opp. at 3.  This additional limitation, which merely reshuffles the abstract idea being claimed, is addressed in the context of the '229 patent, *supra* at II.A.1.c.

Unasserted dependent claims 6, 7, and 11 of the '229 patent (ECF No. 21-3) add purely functional limitations like applying different (unspecified) rules to identify certain types of record objects, assigning "priority levels" to rules (based on unspecified criteria), and considering the "owner" of the record object

or a "team that identifies a group of people" associated with the record object in performing the matching (without specifying how to process this information to achieve the desired result). People.ai states that these claims "recite specific techniques for solving a technical problem" but does not explain how they constitute "techniques" or what "technical problem" they are supposedly solving. Opp. at 2-3.

Unasserted dependent claim 13 of the '783 patent (ECF No. 21-6) requires that in addition to generating a new record object if no existing candidate has a sufficiently high match score, the system "selec[t] a first candidate record object . . . based on the match score" and "add[] a reference to the new[]… record object as an object field value to an object field of the first candidate record object." In other words, this claim recites adding a cross-reference to a file. It is absurd to argue that this somehow adds technological specificity salient to the § 101 inquiry, as People.ai attempts to do. Opp. at 3-4.

According to People.ai's interpretation of "node profile," unasserted dependent claim 18 of the '345 patent (ECF No. 21-7) appears simply to suggest that one or more of the "keyword," "regex," or "logic-based" filtering policies recited in the independent claim should be applied based on information retrieved from a profile of the user whose electronic activity is being filtered—i.e., that the filtering should be personalized in some way. The claim does not specify how or even based on what information. This does not "allow[] for different filtering policies based on a participant's role at a company," Opp. at 4—it does not even go so far as to suggest that a participant's role at a company should be considered in determining what filtering policies to apply.

Dependent claim 17 of the '634 patent (ECF No. 21-4) merely adds more categories of information that can be used to determine (in an unspecified way) the "completion score." It does not add any "detail" that renders the claim anything other than purely functional and abstract. Opp. at 4-5.

In the absence of "any meaningful argument for the distinctive significance of any claim limitations" in the dependent claims, this Court is free to treat the independent claims on which the parties focused their analysis as representative. *Elec.* 830 F.3d at 1352. To the extent People.ai actually made any substantive arguments to the contrary, they fail for the reasons discussed above.

III.    **CONCLUSION**

The Court should grant Clari's motion for judgment on the pleadings because the claims of the asserted patents uniformly recite subject matter ineligible for patenting under 35 U.S.C. § 101.

Dated:  November 4, 2021                    DURIE TANGRI LLP


                                            By:                     */s/ Eugene Novikov*
                                                 DARALYN J. DURIE
                                                 EUGENE NOVIKOV
                                            RAGHAV R. KRISHNAPRIYAN
                                                 ANDREW T. JONES

                                            Attorneys for Defendant CLARI, INC.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 4, 2021 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Eugene Novikov*
EUGENE NOVIKOV